The first case, Buchanan Marine v. Volk. Good morning, Your Honors. My name is Stephen Mellie. I'm with Co-Counsel Richard Nardone. Your Honors, the Hudson River has been a channel for commerce for well over 200 years. And a quarry, a stone quarry, has been operated out of the Clinton Point facility on the east bank of the Hudson River, approximately 60 miles north of New York Harbor, for over 100 years as well, under various names. Each case is fact-specific, and that is particularly true in Jones Act cases. The lower court— What is the definition of a seaman? Well, as Your Honor knows, the Congress did not define seaman and has left it to jurisprudence. The most recent comprehensive definition that controls is Chandra's v. Leithra's definition of the United States Supreme Court in that case emanating from the Second Circuit, defined a two-pronged test for seaman status. In order to become a seaman or to be deemed a seaman, a term of art under the Jones Act, that person, that worker, must establish that he or she had a substantial connection to a vessel by virtue of his or her employment that was substantial both in its nature and its duration, and that the person must perform traditional seaman's work. That's my understanding of the definition. Additionally, and presumptively, a worker claiming seaman status who does not spend or commit time, at least 30% of his or her work day over a period of time, to perform work in aid of navigation of vessels is presumptively not a Jones Act seaman. Here the lower court did not apply the Jones Act test correctly from our point of view. Was the work here in aid of navigation? Mr. Volk was a barge maintainer. Although he was, he obtained his employment of 12 continuous years at this facility through the Operating Engineers Union, he was a barge maintainer, and in doing that, he would spend 100% of his time, except for short breaks, aboard either the barges that he was maintaining with two or three others assigned for that task, as well as on a small boat that was utilized on the Hudson River, which is approximately a mile wide north of here at this location. And in so doing, he would initially in the morning, as he did on the morning of the accident on May 19th, 2011, he would board the barges in the empty rack, which was located on the south side of the loading dock. The barges were used in a continuous operation from Clinton Point, they were taken fully loaded down the Hudson River with large tugs, and there they would be moored for a short period of time at Greenville Mooring here in the harbor. He would ride on the barge from... He would not. He would not. He would remain at the facility. He would maintain every number, each and every one of the barges with two or three others as they were rotated through the Clinton Point facility. He would perform his duties throughout the day, first on the unloaded empty barges, and what's considered to be the empty rack, as it's referred to, on the south side of the loading dock. He would then, in doing so, he would look for cracks in the hull. He would go down below deck through the openings that were provided with a flashlight, look for water down there. When the barge was untied, he would untie lines and ropes, just as seamen do, and then a smaller tug called a push boat, operated by Tilcon, owned by Buchanan, would then take it out into the channel and maneuver it, with him on it, typically, into position. He would be on the barge? He would be on it, yes, before and during and after the loading process, but not away from Clinton Point, per se. Another question is, he is receiving benefits under the Longshore and Harbor Workers' Compensation Act? Yes, he is. And, as I understand it, you can't get both Jones Act benefits and Longshoremen's benefits? In the end, that is correct, but you can plead and prove Jones Act status, and thereby... Benefits better under the Jones Act, I gather? Depends upon the jury award. Depends upon what the jury awards. In other words, if you were to prevail and get Jones Act benefits, then he would give up the Longshoremen's benefits? Well, they would receive a credit at the end of the Jones Act case for benefits received and the present value of benefits in the future, is my understanding, would be taken into account in the final judgment. However, I'm not an expert in Longshore and Harbor Workers' Compensation benefits. I do know, though, if he is not deemed to be a Jones Act seaman in his action, he will still maintain his rights under the Longshore and Harbor Workers' Act. But it is not dispositive that he is receiving benefits or claiming benefits, or might receive them in the future, regarding his claims now, and when he commits this action, that he's entitled to protection under the Jones Act as a Jones Act seaman. But Shanders does say that the two compensation schemes are mutually exclusive. Yes, in the end. If he does recover under the Jones Act, he will have to repay amounts he's received under the Longshore Act? That's my understanding. Standing alone, if this case is not reversed from our point of view, it stands alone as an aberration from not only Chandris, but the leading cases in the Fifth Circuit as well. What about the quarry owner, Tilcon? The claims against Tilcon are based upon common law negligence. Tilcon was responsible for and had control of the vessel for a short period of time during its loading when the stones, millions of pounds of stones that were wet, having been washed, were dumped from the top overhead into the box or to the cargo hold of the vessel, starting at one end. And at that time, it was the necessity of maintaining the barge's ability to maintain flow, you know, in the water. It was still in navigable water at that time. They would tip up in the air, and Wayne Volk would be on the barge, and was on the barge, pumping water from the hull. The water, once it was lifted in the air with the heavy end down, as it was partially loaded, then the water in the hull of the barge would go to that end, and it was necessarily pumped out to avoid capsizing, which had occurred six to eight weeks. What would Tilcon's alleged negligence in that operation? The one thing that the lower court found, and we concur with, is that there's evidence that the gravel that was on the narrow margin deck at the time and place, and date of the slipping incident that Mr. Volk had, that gravel got there either most likely as a combination of the overloading, where the gravel would bounce over the edges of the box or the rail onto the deck during the loading process, but more likely, and it was indisputed, that on each and every occasion with these barges, they're designed so that the water will drain out from the bottom of the cargo hold through these weepers and scuppers, which are nothing but holes with screens, and many of them were rusted and out of repair, and the stones would come out onto the decks as they had that day, which was the cause of his slipping and falling. All right. You saved some time for rebuttal. We'll hear from your colleagues on the other side. Thank you. Good morning, Your Honor. May it please the court. Edward Flood from the Lions and Flood for the Eppley Buchanan Marine, which is the bare-boat charter, and A.P. France, Jr., which is the owner of the barge. What's in issue, what's the dispositive issue here, Your Honors, is the second prong of Chandris. The employee must show a connection to a vessel in navigation or fleet of vessels that is substantial in terms of both its duration and its nature. What's lacking here is the nature component. In short, Mr. Volk, the nature of his work is just not seagoing in nature. As Your Honor pointed out, he doesn't do any duties that aid the navigation of the vessel. My client, Buchanan Marine, owns a number of barges. What about his duties included inspecting the barges, checking for leaks, checking to see whether there was water, tying and untying aren't those traditional, at least arguably traditional, seamen's duties? I don't think so, Your Honor. I think if you look at the purpose of what... Tying and untying lines is not a traditional seamen's duty? Yes, tying and untying lines is traditional seamen's duties, but that really wasn't his job. He would occasionally do that if necessary. There were Tilkan people with a Tilkan vessel who would move the barges from the south side where they were brought in unloaded and then they would bring them to the dock a couple hundred yards away and the barges would be loaded and then they would move to another dock another couple hundred yards away where they would be inspected to go back downriver. What about the inspecting for leaks and making repairs? Aren't those traditional seamen's duties? I don't think so. I mean, keep in mind these are barges that are unmanned. There are no crew members on these barges. The crew members on the tugboats, what they're responsible for is making up the tugboat to the barges. They usually move downriver in a group of maybe eight or 12. And when they're going downriver in transit with the tugboat pushing these barges, they have duties such as lookout acting as a lookout on the tugboat. Does a barge qualify as a vessel in navigation? Yes. A dumb barge like this? I would say it does, Your Honor. But the real issue is the nature of his work. The nature of his work was just really to make sure that these barges could be loaded and then make sure that they were safely to go downriver. Reasonable minds disagree as to whether he fits within the definition? I don't think so. Judges Buchwald and Rakoff looked at very similar cases, not necessarily in regard to loading of barges, but people who worked aboard tugboats, not barges, but tugboats, which does have a crew. Port engineers who fix the engines, who perform all kinds of mechanical work, and they found that their duties were not, in nature, seagoing duties. And some of these individuals even sailed with the tugboat when performing their duties. Because what it really comes down to, Your Honor, is that the work that he was performing in and around these barges, which were essentially tied to the shore, doesn't expose him to perils of the sea, which is what is given to Jones Act seamen who are exposed to those perils when they have to abandon ship at sea, when they have to fight fires on the river or at sea without the aid of any local fire department coming to their These are traditional seamen's perils, which this man was not exposed to. Instead, the types of perils he was exposed to was that of any harbor worker or longshoreman who is on a dock and who could fall into the river or trip on hazards aboard the boat or something like that. And these aren't the kind of protections that are given to these men. And if the circuit were to give these kinds of protections to this individual, then where does it end? I mean, what then is a Jones Act seamen if it is extended to people working on docks like this individual did? There's no distinction. And there clearly has to be a distinction because the Jones Act is an exclusive remedy for Jones Act seamen. And it doesn't include, the remedies are exclusive with the Longshoreman Harbor Workers' Compensation Act. You're either one or the other. And this man, I believe, basically looking at the nature of his work and the perils that he was exposed to was not a Jones Act seamen. My time is up, Your Honor. Thank you. With all due respect, Your Honor. Wait, wait, wait. Oh, I apologize. All right. You'll get a chance. Good morning. May it please the Court. My name is Eric Kurtz. I'm here on behalf of the Longshoreman, which I seem to be lumped in a bit with Buchanan Marine. However, TILCON is a distinct entity in this matter. I think appellant has essentially conceded that most of the causes of action against the TILCON don't exist as far as this case. TILCON did not exist. So what the really issue comes down to is the common law negligence claim against TILCON. And that claim is based upon the existence of stone on the deck of barge B-252 on the date of the accident after it had been loaded. Now, I want to point out to the Court that the testimony is a little bit different than that which has been characterized in the papers. Basically, all of the witnesses have testified that stone during the loading process, if it's the right size stone, will come through weepers or scuppers that have cages that have been rusted out. In fact, the testimony from Portis is basically that he complained to Buchanan about material coming through the weepers and scuppers. And the reason he was complaining about it is because that's material being lost, material that's owned by TILCON that's being lost, and it's also falling into the river, which can cause navigable problems around the dock. So the other issue is where else did that stone possibly come from? And Klayman relies upon his own testimony saying that, well, some stone probably comes over the sides during the loading process. It doesn't say that it did. It says probably. Portis testifies, no, I've never seen stone coming out of the, off the barge during the loading process. Mitchell from Buchanan testifies, no, I never saw, I've seen the loading process, never seen stone spilling over. Perlman testifies, yeah, once in a while there's a minor amount of stone that will come out. And Kahn testifies that, yeah, if the loader goes too far, if he does an error in judgment, stone may come out. But no one says that the stone that the Klayman fell on, on the date of the accident, came from the loading process spilling over. The only thing that's uniform is that the stone came through the weepers as the stone is wet and the weepers are used for water to run out. That's the testimony in the case. Even if this court were to find that there's some question of fact that the Klayman has produced something to establish that he slipped upon stone that fell out over the top of the rail, the district court still correctly determined that the condition was open and obvious. Cases cited by the appellant in their brief all deal with cases with involving seamen or property owners who have a non-delegable duty to maintain a safe premises. Tilcon didn't own the barge in question. This accident did not happen on Tilcon's dock.  Tilcon is not the employer, therefore the issue of Jones Act, whether he's a seaman or not, has no bearing on Tilcon's responsibility. There's no evidence that Tilcon supervised Mr. Volk in any way. There's no evidence that Tilcon ever owned, maintained, or occupied barge B-252. Tilcon employees did not even walk on the decks of barge B-252. The only individual... Tilcon's involved in the loading. Yes, there is a... That has to be the hook then. That's the only potential hook and that is, you know, the stone is dropped from above down onto the barge and then after the stone is measured by Mr. Kahn, he will actually, he's the only Tilcon employee that ever will board the barge and that's simply to measure the product so they know what to bill the customer. But otherwise, there's no other involvement. The stones on the deck is an open and obvious condition and I believe that Your Honor decided a case when he was a district court judge involving a case called Gonzales v. Caballero. It was a ways back, Your Honor. I don't recall it, but... It involved an individual who delivered product to a location but didn't deliver it the way they were supposed to, requiring the person who was receiving that delivery to do something that they normally would not do and they suffered an injury during that process. And basically, Your Honor indicated in that case that there was no duty that was owed to that individual because it wasn't delivered all the way in the proper way to that person. In any event, my time is running out, Your Honor, and unless you have any questions, I will sit down. Thank you. We'll hear the rebuttal. Let me replace the court. This record, established both by the plaintiff... Just to follow up on that last argument, what evidence is there in the record that the loose stone came from the loading of the barge? I can't point to it at the present moment, Your Honor. I believe the lower court was correct in saying there was some evidence that it came from overloading. I believe it's in there. I could point that out subsequently to the court by letter if the court would so desire. I don't have it. Okay. This gentleman worked 100% of the time on vessels, either the barges or the little boat that maintained the barges. How do you respond to the perils of the sea argument that Mr. Volk wasn't exposed to the underlying purpose of the Jones Act and the protections? Perils of the sea is a term of art. It does not refer to going out to the ocean. It is not the sine qua non. It is not a necessary ingredient to Jones Act status. In some courts post Chandris, the court has suggested it's an interesting, albeit unimportant fact or factor that he did not or she did not make voyages out to sea. The perils that are referred to in that term of art, as it has been for at least 25 years, is that the person can fall overboard or go down with a boat. Is there any case in our circuit that has found a barge worker, someone who works on a barge, to be a seaman for purposes of the Jones Act? I want to say Sologub, but I'm not aware of a specific case where the court held that. But if the court does not, in this instance, and from our point of view... You rely heavily on O'Hara, but O'Hara, well, they rely heavily on O'Hara. And O'Hara, the person was working to repair the piers, as I understand. Yes, the lower court said incredibly that this case was on all four square with O'Hara. O'Hara was a carpenter building a pier. He was performing no duties and never had, only on one day. Mr. Volk had worked 12 years continuously on the water, never on the dock. He does not perform a single act of maintenance on the dock. He performs 100% of his duties on the water. And that's the record. It's in the record at 1248, 1249, as established by his supervisor, Mr. Kahn, and by his own testimony. It's indisputable. Finally, the argument that was advanced primarily by the appellee, Buchanan, was based upon an argument in the case of DeWay. I had originally said DeWay, but down that way, it's pronounced DeWay. And DeWay was remanded sua sponte following the decision of Nakin, or Naquin, as some pronounce it, Naquin, in the Fifth Circuit. Within three weeks after the Naquin decision came out, the court sua sponte remanded to state court the issue of Jones Act status. Thank you. Thank you very much.